

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00021-CR

_____

AUSTIN KENNETH CHURKEY, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 2
Tarrant County, Texas
Trial Court No. 1523478D

Before Birdwell, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. Introduction

A jury convicted Appellant Austin Kenneth Churkey of intoxication manslaughter for a drunk-driving incident that resulted in the death of Asheta Goins Holbrook[1] and found true that he had used his vehicle as a deadly weapon. *See* Tex. Penal Code Ann. § 49.08. The jury assessed Churkey's punishment at twelve years' confinement, and the trial court sentenced him accordingly. In four points on appeal, Churkey argues that the State's indictment contained a material variance from the evidence presented at trial; the evidence was insufficient to support the jury's finding of guilt; the trial court failed to perform its gatekeeping function under *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992), when it allowed a witness to testify at the punishment phase of his trial about his violations of his bond conditions; and the trial court abused its discretion by admitting that testimony in violation of Churkey's confrontation rights. We will affirm.

## II. Background

On the evening of October 18, 2017, Asheta took her daughter, Kayla, to a hair salon owned by Asheta's sister, Tyisha. After spending the evening enjoying one another's company and coloring Kayla's hair, the three of them left the salon around

---

[1]Several of the individuals involved in this case have the name "Goins" as all or part of their surname—Asheta Goins Holbrook, Tyisha Goins, and Kayla Goins. To avoid confusion, we will refer to these individuals by their first names.

midnight. Tyisha, who had experienced car trouble with her sedan earlier in the day, left the salon in that vehicle.[2] Asheta, with Kayla as a passenger, left the salon in a sports utility vehicle (SUV). Because of Tyisha's car trouble, Asheta told Tyisha that she would follow her vehicle home.[3]

Initially, everything was fine with Tyisha's vehicle as it left the salon. However, once Tyisha got onto Interstate 20 traveling east, her sedan "just wasn't driving right," so she pulled over to the right-hand shoulder of the highway.[4] Asheta, who was following Tyisha, pulled her SUV onto the shoulder behind Tyisha's sedan. Asheta then drove her SUV past Tyisha's sedan and turned it around, so that her SUV was "nose to nose" with Tyisha's sedan. According to Tyisha, both her and Asheta's vehicles were stopped safely on the highway's shoulder.

Asheta and Tyisha then exited their respective vehicles to begin the process of jump-starting Tyisha's sedan. Both women stood on the shoulder of the highway between the two vehicles. Asheta connected a set of jumper cables to her SUV, and she and Tyisha started trying to locate the battery of Tyisha's sedan so that they could

---

[2]Tyisha testified that her car had started "acting funny" earlier in the day just before she had arrived at the salon. Before leaving the salon for the night, the owner of a nearby business gave her car "a jump" to get it started.

[3]At the time of the incident, Asheta, Kayla, Tyisha, and other family members were living together.

[4]Tyisha believed that the shoulder was a "safe place" to stop, noting that there was grass to the right of the shoulder.

connect the jumper cables. Unbeknownst to the two women, a truck driven by an intoxicated Churkey was moving toward them. According to Tyisha, she suddenly heard "a big bang," saw a bunch of debris flying, and was knocked to the ground.[5] She woke up[6] to Kayla screaming Asheta's name.

When Tyisha got up, she and Kayla started looking for Asheta, but they could not find her. Someone at the scene suggested that they look under Churkey's truck, and upon looking, they found Asheta. Tyisha stated that she and Kayla started banging on Churkey's truck, imploring him to help them. According to Tyisha, Churkey responded, "Help with what[?]" and "What do y'all want me to do[?]"

Two passing motorists—Timothy Runyan and James Enlow—soon arrived at the scene and offered assistance. Runyan was driving an 18-wheeler eastbound on Interstate 20 at the time of the collision. Moments before the collision, Runyan observed Churkey's truck pass him in the left lane—at a speed Runyan estimated to be around 75 to 80 miles per hour—and then it moved in front of Runyan's 18-wheeler and "started swerving from lane to lane." According to Runyan, it appeared that Churkey "was trying to keep his lane, but he kept on going over it . . . and going back real fast." Runyan called 911 "to report a suspicious drunk driver," and he saw

---

[5]Tyisha testified that she did not see Churkey's truck coming toward them. She also stated that both she and Asheta "got hit."

[6]Tyisha indicated that she was briefly rendered unconscious as a result of the collision.

4

the collision while he was on the call.[7]  As described by Runyan, it looked like Churkey was going to exit the highway as he came upon Green Oaks Boulevard, but instead, Churkey moved his truck into the shoulder where Tyisha's sedan and Asheta's SUV were located.[8]  Runyan did not see Churkey's truck slow down as it approached the vehicles, nor did he see Churkey take any evasive action.  According to Runyan, Churkey then "hit the cars."[9]

Runyan got out of his 18-wheeler to help.  He found Asheta "[u]nderneath the front wheel and the driver's side" of Churkey's truck.  Asheta was unresponsive but had a pulse.  Runyan approached the passenger's side of Churkey's truck and told him to turn the truck off because Runyan "saw a bunch of sparks coming up from underneath the hood" of Churkey's truck and because Churkey was "trying to actually move the truck" while Asheta was still underneath it.[10]  Runyan indicated that he had tried to tell Churkey to shut his truck off and stop trying to move it because Asheta

---

[7]The jury heard audio from Runyan's 911 call.  The jury also heard audio from a different 911 call that another motorist had made to report Churkey's suspicious driving.  That caller indicated that there was a "drunk driver on the road," and seconds later, the caller indicated that the suspected drunk driver "just had a wreck."

[8]According to Runyan, Tyisha's sedan had its "emergency flashers" on.

[9]Photographs taken of the scene depict damage to the back passenger's side of Tyisha's sedan, the front of Asheta's SUV, and the front and driver's side of Churkey's truck.  The photographs also reflect (and Tyisha testified) that Asheta's SUV had rotated so that it was facing eastbound after the wreck.

[10]In the audio from Runyan's 911 call, Runyan and others can be heard in the background frantically and repeatedly telling Churkey to shut his truck off.

was underneath it, but Churkey "wouldn't understand what [Runyan] was saying." Runyan testified that he had "smelled a lot of booze" coming from Churkey's truck.

Enlow was driving westbound on Interstate 20 in Arlington when he heard the collision on the other side of the highway. He then drove to the scene to help. Enlow testified that Asheta was "tangled up in the exhaust" of Churkey's truck and that she was unresponsive. He asked Churkey several times to get out of his truck, but Churkey did not answer.[11] Enlow also indicated that Churkey attempted to start his truck while Asheta was underneath it. Enlow retrieved a floor jack from the back of his vehicle and used it to raise Churkey's truck so that Runyan and a police officer could pull Asheta out from under the truck.[12] After Asheta was removed from Churkey's truck, she was transported to the hospital, where she died.

Edward Johnston, an Arlington police officer who was a member of the department's DWI unit in 2017, testified that he responded to the incident and arrived to a "very chaotic" scene.[13] Johnston stated that a "very distraught" Churkey was outside of his truck when Johnston arrived and that Churkey indicated that he was

---

[11]Enlow testified that Churkey eventually got out of his truck and walked past him accompanied by police. Enlow smelled a "[s]trong" odor of alcohol coming from Churkey as he passed.

[12]Runyan testified that Churkey remained in his truck while he and the police officer pulled Asheta out from under it.

[13]Johnston indicated that multiple police officers were already on the scene by the time he arrived.

trying to help and did not know that Asheta was under his truck. In describing the wreck, Churkey told Johnston that he had seen brake lights in front of him; that the cars in front of him had slammed on their brakes; that he had applied his brakes and had tried to pull off to the side of the highway to get out of the way of the other cars; and that he had not meant for the wreck to occur.[14]

Johnston observed that Churkey had "red, watery, bloodshot eyes" and that "a strong smell of alcohol came from his breath as he spoke." Accordingly, Johnston administered three standard field sobriety tests on Churkey. Churkey met the "decision point" for arrest on each of the tests.[15] Following the administration of those tests, Johnston arrested Churkey because he believed that Churkey had been driving while intoxicated. Johnston then took Churkey to the hospital, where Churkey consented to a blood draw.

Katie Scott—a forensic toxicologist with the Tarrant County Medical Examiner's Office—analyzed the results of Churkey's blood draw. According to

---

[14]A crash reconstruction was not performed in this case because Churkey's truck was moved following the collision in an attempt to save Asheta's life. As explained by an accident reconstructionist who testified at Churkey's trial, "[p]art of being able to do a reconstruction is you have to know without a doubt where the vehicles came to rest after a collision." That witness also testified that a photogrammetry program used by Arlington police in 2017 that was supposed to map out crash scenes was "sorely lacking," further preventing efforts to make a reconstruction of the subject wreck.

[15]Johnston explained that a subject "[does] not pass or fail" standard field sobriety tests; rather, a subject either meets or does not meet a "decision point" for arrest with respect to each of the tests.

Scott, Churkey's blood alcohol concentration was 0.16 at the time his blood was drawn—twice the legal limit in Texas. *See* Tex. Penal Code Ann. § 49.01(2)(B).

Richard Fries, the deputy medical examiner for the Tarrant County Medical Examiner's Office, performed Asheta's autopsy. Fries observed that Asheta had suffered two lacerations to the right ventricle of her heart, injuries that Fries described as "fatal." He opined that those lacerations were "consistent with being hit by a vehicle." Fries also observed that Asheta had suffered tears to her right kidney and right adrenal gland. He stated that those tears would have caused internal bleeding and been "life-threatening." He testified that those tears "are common injuries in blunt force trauma, particularly in motor vehicle collisions" and that they are "consistent with a pedestrian being struck by a vehicle."

Fries also observed that Asheta had sustained multiple lacerations to her liver, multiple fractured ribs, and a fractured pelvic bone. He stated that those injuries are "[c]ommon in blunt force trauma, particularly in auto/pedestrian collisions." He also opined that "many of [Asheta's injuries] would be fatal in and of themselves, and certainly the combination of those [was] also life-threatening and fatal in this case." According to Fries, Asheta's cause of death was "multiple blunt force injuries due to a pedestrian being struck by a motor vehicle," and her manner of death was homicide.

8

## III. DISCUSSION

### A. Churkey's complaints of material variance and insufficient evidence

In his first point, Churkey argues that the State's indictment contained a material variance from the evidence presented at trial. In his second point, Churkey argues that the evidence was insufficient to support his conviction. Because both of these points implicate the sufficiency of the evidence, we will discuss them together. *See Lyon v. State*, No. 02-17-00195-CR, 2018 WL 6816209, at *9 (Tex. App.—Fort Worth Dec. 27, 2018, pet. ref'd) (mem. op., not designated for publication) ("Under Texas law, a variance between the allegations in the indictment and the evidence at trial is a matter of evidentiary sufficiency.").

#### 1. Standard of review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim.

9

App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Hammack*, 622 S.W.3d at 914. The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021);

10

*see Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements."). This standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021), *cert. denied*, 142 S. Ct. 859 (2022).

### 2. Applicable law

A variance occurs when there is a discrepancy between the allegations in the charging instrument and the proof at trial. *Gollihar v. State*, 46 S.W.3d 243, 246 (Tex. Crim. App. 2001). When a variance occurs, the State has proven the defendant guilty of a crime but has proven its commission in a manner that varies from the allegations in the charging instrument. *Id.* There are two types of variances in an evidentiary-sufficiency analysis: material variances and immaterial variances. *Thomas v. State*, 444 S.W.3d 4, 9 (Tex. Crim. App. 2014). Immaterial variances do not affect the validity of a criminal conviction; thus, a hypothetically correct jury charge need not incorporate allegations that would give rise to only immaterial variances. *Id.* But a material variance renders a conviction infirm, and the only remedy is to render an acquittal. *Id.*

A variance is material only if it prejudices the defendant's substantial rights. *Lyon*, 2018 WL 6816209, at *9 (citing *Gollihar*, 46 S.W.3d at 257). A defendant's

11

substantial rights are not prejudiced so long as the indictment, as written, informed the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial and so long as the deficiently drafted indictment would not subject the defendant to the risk of being prosecuted later for the same crime. *Id.* (citing *Gollihar*, 46 S.W.3d at 257).

A person commits intoxication manslaughter if the person (1) operates a motor vehicle in a public place, (2) is intoxicated, and (3) by reason of that intoxication causes the death of another by accident or mistake. Tex. Penal Code Ann. § 49.08(a).

### 3. Analysis of Churkey's material-variance complaint

The State's indictment alleged that Churkey operated a motor vehicle in a public place while intoxicated, and by reason of that intoxication, caused Asheta's death "by driving said motor vehicle into or against" her. On appeal, Churkey argues that there was "no proof" that his truck "actually drove into or against" Asheta, and, accordingly, he argues that the indictment contains a material variance from the evidence presented at trial.

We disagree that there is any variance—material or otherwise—between the allegations in the indictment and the evidence presented at trial. The jury heard substantial evidence by which they could, at the very least, infer that Churkey's truck drove "into or against" Asheta. In this regard, Tyisha testified that both she and Asheta "got hit." Further, Asheta was ultimately found underneath Churkey's truck. Runyan stated that Asheta was "[u]nderneath the front wheel and the driver's side" of

12

Churkey's truck, and Enlow said that Asheta was "tangled up in the exhaust" of Churkey's truck. Perhaps more importantly, Fries—the deputy medical examiner—testified that the lacerations suffered to Asheta's right ventricle were "consistent with [her] being hit by a vehicle." He also stated that the tears to her right kidney and right adrenal gland were "consistent with a pedestrian being struck by a vehicle." Likewise, he opined that the multiple lacerations to Asheta's liver, her multiple fractured ribs, and her fractured pelvic bone were injuries that were "[c]ommon in blunt force trauma, particularly in auto/pedestrian collisions." And ultimately, Fries concluded that Asheta's cause of death was "multiple blunt force injuries due to a pedestrian being struck by a motor vehicle."

A rational juror could infer from all of this evidence that Churkey's truck drove "into or against" Asheta, and, thus, there is no variance.[16] *See Russell v. State*, No. 02-20-00024-CR, 2022 WL 1043129, at *5 (Tex. App.—Fort Worth Apr. 7, 2022, pet. ref'd) (mem. op., not designated for publication) (holding that there was no variance

---

[16]Even if there was a variance, we fail to see how it would be material, and Churkey has not explained how the alleged variance prevented him from preparing a defense or how he could be prosecuted again under the same facts. *See Hilburn v. State*, 312 S.W.3d 169, 175 (Tex. App.—Fort Worth 2010, no pet.) (holding that variance, if any, was not material where charging instrument alleged death was caused by defendant driving his vehicle "into and against a motor vehicle occupied by [the victim]" while proof at trial showed that victim did not die by blunt force trauma but died from his vehicle catching on fire); *Megas v. State*, 68 S.W.3d 234, 241 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (holding that variance, if any, was not material where charging instrument alleged death was caused by collision with concrete barrier and proof at trial showed collision caused the vehicle to flip and crush victim).

between allegation in indictment that defendant "stood in front of the entry gates" and proof at trial that defendant was "part of a group that formed a 'human chain'" where jury could have inferred from testimony that "the human chain necessarily blocked the gates"). We overrule Churkey's first point.

### 4. Analysis of Churkey's sufficiency complaint

Churkey argues that "there was insufficient evidence to prove that [his] intoxication caused [Asheta's] death." Churkey points to evidence that Asheta's SUV "was pointing in the opposite direction of travel" and had its headlights on while facing the eastbound traffic on Interstate 20. He suggests that "[i]t is entirely possible that this situation caused [him] to become disoriented and take action to try and avoid a collision."

It is undisputed that Churkey was operating a motor vehicle in a public place while intoxicated. In this regard, the evidence reflects that Churkey was driving on Interstate 20 in Arlington, that he smelled of alcohol at the scene of the crash, that he met the "decision point" for arrest on three separate standard field sobriety tests, and that his blood alcohol concentration was 0.16 at the time his blood was drawn.

As to whether his intoxication caused Asheta's death, the evidence reflects that immediately before the crash, two witnesses were so concerned about Churkey's erratic driving that they initiated 911 calls. Runyan testified that Churkey was "swerving from lane to lane" and that he was having difficulty maintaining his lane. Contrary to Churkey's argument that he was disoriented and took action to avoid the

14

collision, Runyan testified that he did not see Churkey's truck slow down as it approached Asheta and Tyisha, nor did he see Churkey take any evasive action. As to Churkey's suggestion that he was disoriented by Asheta's headlights, Tyisha testified that the hood of her sedan was up, making it "kind of impossible" for Asheta's headlights to have "blinded" other drivers. And, of course, Churkey did not mention to police officers that he was disoriented by Asheta's headlights; rather, Churkey told Johnston that he had seen brake lights in front of him; that the cars in front of him had slammed on their brakes; and that he had applied his brakes and had tried to pull off to the side of the highway to get out of the way of the other cars. After viewing all the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that Churkey (1) operated a motor vehicle in a public place; (2) was intoxicated; and (3) by reason of that intoxication caused Asheta's death by accident or mistake. *See* Tex. Penal Code Ann. § 49.08(a); *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. We overrule Churkey's second point.

## B. Churkey's complaints that the trial court admitted evidence in violation of *Kelly* and his confrontation rights

In his third point, Churkey argues that the trial court failed to perform its gatekeeping function under *Kelly*[17] by permitting a witness to testify at the punishment

---

[17]"Under *Kelly*, a trial judge, upon request, must conduct a 'gatekeeping' hearing outside the presence of the jury to determine whether scientific evidence is sufficiently reliable and relevant to help the jury in reaching an accurate result." *Coleman v. State*,

15

phase of his trial about his violations of certain bond conditions. In his fourth point, Churkey argues that the trial court abused its discretion by admitting that testimony over his confrontation objection.[18]

### 1. The complained-of testimony and Churkey's objection

During the punishment phase of Churkey's trial, Stacy Franco, a senior court probation officer, testified that Churkey had been placed on bond while awaiting trial. Churkey's bond conditions required that he abstain from using controlled substances, including marijuana; that he refrain from drinking alcohol; and that an ignition interlock device be installed on any vehicle that he drove. Franco stated that Churkey had committed bond violations while he was awaiting trial.

Churkey's attorney then took Franco on voir dire outside the jury's presence, where Franco indicated that Churkey had consumed alcohol and tested positive for marijuana while on bond. Franco stated that her knowledge of those two infractions was "primarily on the basis of records created by someone else"—records that were not admitted at Churkey's trial. Churkey's attorney objected to Franco testifying about the bond violations, stating that she was "not a personal witness to the bond

---

440 S.W.3d 218, 226 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *see Kelly*, 824 S.W.2d at 572–73.

[18]In a criminal prosecution, a defendant has a Sixth Amendment right to confront adverse witnesses. *Giles v. California*, 554 U.S. 353, 357–58, 128 S. Ct. 2678, 2682 (2008) (citing *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004)).

16

violations" and that her testimony regarding the bond violations left Churkey with "the inability to confront . . . those allegations." The trial court overruled Churkey's objection.

Back before the jury, Franco testified that Churkey had violated his bond in May 2021 due to a "positive blow" on his ignition interlock device, indicating that he had been drinking alcohol. She also told the jury that Churkey had violated his bond in May 2019, stating that he had tested positive for marijuana.

### 2. Churkey's failure to preserve his *Kelly* complaint

The State argues that Churkey did not preserve his *Kelly* complaint because "[h]e did not complain [to the trial court] about the State's alleged failure to satisfy the *Kelly* requirements for the reliability of scientific evidence." We agree.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). Further, the party must obtain an express or implicit adverse trial-court ruling or object to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Dixon v. State*, 595 S.W.3d 216, 223 (Tex. Crim. App. 2020). An objection preserves only the specific ground cited. Tex. R. App. P. 33.1(a)(1)(A); Tex. R. Evid. 103(a)(1)(B); *Mosley v. State*, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh'g).

Here, Churkey did not object to the admission of Franco's testimony on *Kelly* grounds. Thus, he has failed to preserve his complaint on appeal that the trial court failed to perform its gatekeeping function under *Kelly*.[19] *See Straker v. State*, No. 08-14-00111-CR, 2016 WL 5845826, at *10 n.10 (Tex. App.—El Paso Sept. 30, 2016, no pet.) (not designated for publication) ("Appellant appears to contend that many, if not all, of [the witness's] conclusions lacked a sufficient scientific foundation, and therefore should not have been admitted at trial. Appellant never objected to [the witness's] testimony on this basis at trial, however, and we therefore decline to address these challenges on appeal."); *Parker v. State*, No. 14-09-00104-CR, 2010 WL 2784428, at *6 n.2 (Tex. App.—Houston [14th Dist.] July 15, 2010, pet. ref'd) (mem. op., not designated for publication) (noting that "[s]everal courts of appeals have determined that a specific objection to scientific evidence is necessary to preserve a corresponding appellate complaint"). We overrule Churkey's third point.

―――――――――――

[19]In his brief, Churkey references a pre-trial motion that he filed requesting that the State disclose the facts or data underlying any expert opinions and that he be allowed to conduct a voir dire examination directed to the underlying facts or data upon which the opinion was based before any expert testified before the jury. But that motion did not alert the trial court or the State that Churkey was objecting to Franco's testimony based on *Kelly*, nor did the trial court ever rule on that motion. Thus, the mere filing of Churkey's pre-trial motion did not preserve his *Kelly* complaint. *See Dixon*, 595 S.W.3d at 223 (holding that to preserve error, the complaining party must obtain a ruling on its objection, or absent a ruling, the complaining party must object to the trial court's refusal to rule); *Fierro v. State*, 706 S.W.2d 310, 317–18 (Tex. Crim. App. 1986) (holding that a general objection is insufficient to apprise the trial court of complaint urged and thus preserves nothing for review).

**3. Churkey has not been harmed by the admission of Franco's testimony**

With respect to his confrontation complaint, assuming, without deciding, that the trial court erroneously admitted Franco's testimony regarding Churkey's bond violations, any error was harmless. Error in admitting evidence in violation of confrontation rights is constitutional error subject to a constitutional harm analysis. *Langham v. State*, 305 S.W.3d 568, 582 (Tex. Crim. App. 2010); *see* Tex. R. App. P. 44.2(a). Under this analysis, reversal is required unless we determine beyond a reasonable doubt that the trial court's error in the admission of the testimony did not contribute to Churkey's punishment. *See* Tex. R. App. P. 44.2(a); *Wells v. State*, 611 S.W.3d 396, 410 (Tex. Crim. App. 2020).

Our harmless-error analysis should not focus on the propriety of the trial's outcome but rather should focus on whether the constitutional error adversely affected the integrity of the process leading to the punishment. *See Wells*, 611 S.W.3d at 410. To that end, we "should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting Tex. R. App. P. 44.2(a)). While the most significant concern must be the error and its effects, the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error. *Wells*, 611 S.W.3d at 410.

We evaluate the entire record in a neutral manner and not in the light most favorable to the prosecution. *Id.* at 410–11.

Churkey argues that Franco's testimony was harmful, claiming that Franco's testimony regarding "the interlock violation was the only evidence that [Churkey] drank alcohol while on bond" and that her testimony regarding "[t]he positive drug test was the only evidence of [Churkey] consuming drugs" while on bond. Those assertions belie the evidence.

During the punishment phase, Churkey admitted that he "did have the two times where [he had] failed on the bond part." When asked to elaborate on those bond violations, Churkey testified that he "had had a moment of crisis and a relapse" in May 2021, where he "had a bad day" and "end[ed] up drinking alcohol." As to his failed drug test, the following exchange occurred:

> Q. Let's talk about your drug use. In the last five-and-a-half years, have you consumed drugs?
>
> A. It was shown that I have had – I've used marijuana.
>
> Q. It was shown that you had used marijuana. So did you?
>
> A. I did.
>
> Q. Okay. On that one occasion?
>
> A. Yes.
>
> Q. Was there a second occasion?
>
> A. No.

20

In light of Churkey's admission during the punishment phase of his trial that he drank alcohol and used marijuana while on bond, and after carefully reviewing the record and performing Rule 44.2(a)'s required harm analysis, we hold beyond a reasonable doubt that the trial court's error, if any, in admitting Franco's testimony did not contribute to Churkey's punishment.[20] *See* Tex. R. App. P. 44.2(a); *McNac v. State*, 215 S.W.3d 420, 424–25 (Tex. Crim. App. 2007) (holding that any error in the trial court's admission of evidence that allegedly violated the appellant's confrontation rights was harmless where evidence was cumulative of other unchallenged evidence); *Pritchard v. State*, No. 2-08-137-CR, 2009 WL 112717, at *4 (Tex. App.—Fort Worth Jan. 15, 2009, pet. ref'd) (mem. op., not designated for publication) (similar). We overrule Churkey's fourth point.

## IV. CONCLUSION

Having overruled Churkey's four points, we affirm the trial court's judgment.

---

[20]Similarly, even if Churkey had preserved his *Kelly* complaint, we would likewise hold that any error made by the trial court with respect to Franco's testimony was harmless due to Churkey's testimony that he had consumed alcohol and used marijuana in violation of his bond conditions. *See* Tex. R. App. P. 44.2(b) (requiring us to disregard any nonconstitutional error that does not affect an appellant's substantial rights); *Sandone v. State*, 394 S.W.3d 788, 794 (Tex. App.—Fort Worth 2013, no pet.) ("The improper admission of evidence is harmless if the same or similar evidence is admitted without objection at another point in the trial.").

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  December 14, 2023